**Dale Austin SHELTON, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–76–320.**

Court of Criminal Appeals of Oklahoma.

Sept. 30, 1976.

Don Anderson, Public Defender, Oklahoma County, for appellant.

Larry Derryberry, Atty. Gen., for appellee.

## MEMORANDUM OPINION

BUSSEY, Judge:

Dale Austin Shelton, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Oklahoma County, Case No. CRF–75–884, for the crime of Burglary in the Second Degree in violation of 21 O.S.1971, § 1435. His punishment was fixed at three (3) years' imprisonment, and from said judgment and sentence a timely appeal has been perfected to this Court.

At the trial, the first witness for the State was Officer Brown of the Oklahoma City Police Department, who testified that about 2:00 a. m. on March 8, 1975, he responded to a call originating from a silent alarm and went to the unit block on North May at Reno, which was the rear of the Spartan-Atlantic Department Store. He noticed the door of an incinerator furnace standing ajar and footprints in the ashes inside. He closed the door and barred it from the outside. From the front of the building he then saw two persons crawling around inside the store. He returned to the furnace where he opened the door and two persons emerged—one David Arlin Speaks (a co-defendant in this case) and a juvenile female. Both were arrested. Nearby he saw a pair of bolt cutters and a cut lock (Exhibits 1 and 2). The latch arm on the incinerator door was replaced to hold the door shut so that it could be opened from the outside, but not from the inside. Brown went on about his business and approximately an hour later responded to a second silent alarm at the Spartan-Atlantic Store. As he arrived, he saw defendant in custody of police officers.

Ulester Rucker testified that he was employed by the American District Telegraph Company, commonly called ADT, which operated the silent alarm systems. He recorded the first alarm, notified the police and the store manager and went to the store. Police had surrounded the building and soon arrested two persons emerging from the exterior incinerator door. Rucker then helped search the store and closed the interior incinerator door so that it could be opened either from inside the incinerator or from inside the store. At approximately 2:30 a. m. he received a sec-

ond alarm from the store and again notified police and the store manager and returned to the store. As he and the manager were starting to search the store, defendant came out of the storeroom with his hands raised. Rucker went to the storeroom and noticed that the interior incinerator door was open.

Roy House testified that he was the store manager and on the evening of March 7, 1975, he secured the store and set the silent alarm system in operating condition. He explained that the incinerator has an exterior door for removal of ashes, which was locked with a padlock, and an interior door on the storeroom which was shut but not locked that night. Exhibit 2, the padlock that secured the hasp on the exterior incinerator door, was in good condition when he left the store. House received notice from the ADT about 1:00 a. m. of the store alarm. When he arrived at the store police were there. While they were searching the building, he learned that police had captured two persons emerging from the exterior incinerator door. He discovered the bolt cutter and cut padlock. On closing the store this time he secured the exterior incinerator door by dropping a bolt into the hasp latch, such that the door could be opened by one on the outside, but not the inside. After he had been home about thirty minutes, he received word of another ADT alarm and returned to the store. Upon entering with a policeman, he saw a head appear from behind one of the storeroom doors. As officers approached, the defendant came out with his hands raised and the police arrested defendant.

Officer Minor, of the Oklahoma City Police Department, testified that he interrogated defendant, first giving the Miranda warning. Defendant related that the evening before his arrest he was at the Allen residence (which was just behind the Spartan-Atlantic Store) with the Allen daughter, Tisha, defendant's girlfriend Spunky, and David Speaks (the co-defendant). A man drove up and told them he worked at the store and could get in any time through the incinerator. On the night of defendant's arrest he, Tisha and Speaks inspected the incinerator. Defendant left and shortly returned and saw Tisha and Speaks enter the incinerator. By the time he got there they were already inside the store. He followed them in the store but could not find them. He tried to exit through the exterior incinerator door, but could not open it. He was arrested by police in the storeroom. He denied cutting the padlock and stated the exterior incinerator door was open when he entered.

For the defendant, Tisha Allen testified that she was seventeen years old and lived with her parents just behind the Spartan-Atlantic Store. That night Speaks came over and told her and defendant that Spunky and one Phillip had just gone in the store and were going to get in trouble. She, defendant and Speaks went over to the store to "holler and try to get them out." (Tr. 68) The incinerator door was wide open and the three entered. The interior incinerator door was open and she and defendant went into the store (Speaks remaining in the incinerator), and called for Spunky and Phillip, but received no answer. They started back out and she and Speaks were in the incinerator when the police arrested them. The interior incinerator door had fallen shut and defendant was trapped inside the store. She denied going into the store to steal anything but stated she went in to get Spunky out before she got into trouble.

Defendant testified that he was eighteen years old at the time of his arrest. On the night in question he was at Tisha Allen's house with Speaks and Spunky and one Phillip. The latter three left and around 12:30 to 2:00 a. m. Speaks returned and stated that Phillip and Spunky had gotten into the store and were going to get into trouble. Defendant, Speaks and Tisha went to the store. The exterior incinerator door was open and the three entered. Speaks stayed in the incinerator while defendant and Tisha went in the store calling

for Spunky. Tisha returned into the incinerator and defendant undertook to follow her, but the interior incinerator door fell shut and defendant was trapped inside the store. He finally got it open but found he could not open the exterior incinerator door. He returned to the storeroom where he was eventually discovered by police and arrested. He denied any knowledge of the bolt cutter and testified he went into the store only to get Spunky. He gave the statement to Officer Minor only because Del City police threatened to charge him with other offenses and send him to McAlester if he did not.

As his first assignment of error, defendant contends that the evidence was insufficient to support the verdict of the jury. In *Disheroon v. State,* Okl.Cr., 357 P.2d 236, we stated:

"In the trial of a criminal case, questions of fact involving the guilt or innocence of the accused are always for the jury, and when, on appeal, the record discloses facts which would have been sufficient either to warrant a verdict of acquittal or to support a verdict of guilty, the finding of the jury will not be disturbed. In such cases only errors of law will be reviewed."

Further, in *Williams v. State,* Okl.Cr., 373 P.2d 91, we held:

"Where there is competent evidence in the record from which the jury could reasonably conclude that the defendant was guilty as charged, the Court of Criminal Appeals will not interfere with the verdict, even though there is a sharp conflict in the evidence and different inferences may be drawn therefrom, since it is the exclusive province of the jury to weigh the evidence and determine the facts."

Accordingly, we find the first assignment of error to be without merit.

As his final assignment of error, defendant contends that the punishment imposed is excessive. We have consistent-

ly held that the question of excessiveness of punishment must be determined by a study of all the facts and circumstances in each case, and the Court of Criminal Appeals does not have the power to modify a sentence unless we can conscientiously say that under all the facts and circumstances the sentence is so excessive as to shock the conscience of the Court. See, *Johnson v. State,* Okl.Cr., 386 P.2d 336. Certainly, we cannot say that a sentence of three (3) years' imprisonment shocks the conscience of the Court, and we accordingly find this assignment of error to be without merit.

For all of the above and foregoing reasons, the judgment and sentence appealed from is AFFIRMED.

BRETT, P. J., and BLISS, J., concur.